<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br><br>v.<br><br>**DEVIN TRAVIS.** | Criminal Action No. 24-265 (ZNQ)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

 **THIS MATTER** comes before the Court upon Defendant Devin Travis's ("Defendant") Omnibus Motion in which he moved to suppress a firearm pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) as well as requested disclosure of various pre-trial discovery material. (ECF No. 18.)  Defendant submitted a brief in support of his Motion ("Moving Br.," ECF No. 18), to which the United States filed an opposition ("Opp'n Br.," ECF No. 19.)  Defendant submitted a reply.  ("Reply Br.," ECF No. 20.)  The Court has reviewed the parties' submissions and held an evidentiary hearing on December 5, 2024 ("the suppression hearing").  For the reasons set forth below, the Court will **GRANT** the portion of Defendant's motion seeking to suppress the firearm.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

 Stemming from the seizure of a firearm and his arrest on the night of February 13, 2024, Defendant was charged in a one count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)  On April 24, 2024, Defendant entered a plea of not guilty.  (ECF No. 4.)  Defendant's Motion seeks to suppress the firearm on the basis that the arresting officers conducted an unlawful stop and frisk.

At the suppression hearing,[1] the United States called one of the arresting officers, East Orange Police Officer Jah-vel Henry, to testify, and introduced into evidence Officer Henry's body camera footage, East Orange Police Officer Errol M. Lindo's body camera footage, and photographic evidence of the firearm seized.[2]  Defendant did not call any witnesses but introduced into evidence Officer Lindo's police report and the affidavits of Defendant and his girlfriend, Raynette Smith.[3]  At the close of the hearing, the Court reserved decision.

Based on the testimony of Officer Henry and exhibits received in evidence, the facts adduced are as follows.

On February 13, 2024, at around 12:30 a.m., Officers Lindo and Henry were dispatched to an apartment building at 67 South Munn Avenue, East Orange, New Jersey based on a report of a male looking into cars in the parking lot and trying to gain access to the building.  (Tr. at 12:21-13:4.)  Upon arrival, the officers spoke with the 911 caller, the building's security guard, Fantashia Severe ("Severe").  (*Id.* at 14:14-21.)  Police then followed Severe to the building's back entrance where Defendant could be seen on the building's video surveillance.  (*Id.* at 14:22-24.)

Defendant and another woman were at the back entrance.  (*Id.* at 14:25-15-3.)  In response to the United States' questioning at the hearing, Officer Henry testified to the following exchange that took place between the officers, Defendant, and the woman:

> Q: At that time, did you speak with a man that was at the door?
>
> A: Yes.

---

[1] A transcript of the full suppression hearing has been prepared and is cited herein as "Tr."
[2] Officer Lindo's body camera footage was played by the United States at the suppression hearing during Officer Henry's testimony.  It was also provided to the Court in support of Defendant's Motion.
[3] Raynette Smith attests that she is a resident of 67 South Munn Avenue, East Orange, New Jersey, apartment 8E, and that Defendant was there to visit her on the night in question, but she had fallen asleep prior to Defendant's arrival and did not answer Defendant's calls to let him into the building.  (Ex. G.)  Officer Henry testified that Smith arrived at the back door after their arrest of Defendant which is when the officers learned that she lived there.  (Tr. at 22:5-14.)

Q: What, if anything, did you ask him?

A. We asked him, Why are you here?

Q. How did he respond?

A. He just said I'm here to see someone.  Never specified who.

Q. Was the woman who was also at the back door permitted to enter the building?

A. We asked her as well, Do you live here? Do you have ID? And she said, I live here, but it's not -- not my ID, but the gentleman that walked in from inside the building, he said he's here to let her in and also the security guard said she knows her and she lives here.

Q. Did that security guard say anything about whether the man lived in the building?

A. She said she doesn't know him.  He doesn't live here.

Q. Did you and Officer Lindo ask him if he had any identification?

A. Yes.

Q. Did he have any identification?

A. No.

Q. Did he tell you that he had a key to get into the building?

A. No.

*Id.* at 15:9-16:9.

Ultimately, the officers allowed the woman to enter the building but continued speaking with Defendant who had his hands in his jacket pockets.  (*Id.* at 16:10-11.)  Officer Henry testified that either he or Officer Lindo then asked Defendant to take his hands out of his jacket pockets "for safety reasons" and Defendant complied.  (*Id.* at 16:12-16.)  Officer Henry admitted that when

Defendant took out his hands, he also removed some items that he had in his pockets, but that

Officer Henry was not able to see if Defendant emptied his pockets completely. (*Id*. at 30:22-25,

38:9-11.) Defendant then put his hands back into his pockets. (*Id.* at 16:20-21.) Subsequently,

Officer Lindo asked Defendant to put his hands against the wall for a pat down. (*Id*. at 16:20-24.)

Following a brief tussle, Officer Henry felt a "bulge, a butt handle of the gun inside [Defendant's]

pants" and was able to "remove the firearm from inside his pants." (*Id*. at 18:15-18.) Defendant

was subsequently arrested. The entire encounter lasted around one minute and a half, from the

beginning of the interaction to the frisk. (Ex. D.)

During Officer Henry's testimony, the Court asked additional questions to clarify the

circumstances, including whether Officer Henry arrested or could have arrested Defendant for

trespassing.

> THE COURT: . . . .You didn't arrest Mr. Travis for trespassing,
> correct?
>
> THE WITNESS: No, sir.
>
> THE COURT: There's no mention of trespassing at all in this police
> report. You've seen it, right, Officer Lindo's investigation report?
>
> THE WITNESS: Yes.
>
> THE COURT: Did you think you had probable cause to
> -- you didn't have probable cause to arrest him, right?
>
> THE WITNESS: No. We just inquire like the security
> guard stated that he's looking into vehicles, so we wanted --
> first we wanted to identify who the male was.
>
> THE COURT: But my question is very specific. You
> didn't have probable cause to arrest Mr. Travis for
> trespassing.
>
> THE WITNESS: No, sir.

Tr. at 20:8-22.

As to Defendant putting his hands in his pockets, the Court asked the following:

THE COURT: I want to make sure I saw what's in the body cam. You guys initially direct him to take his hands out of his pockets. Is that fair?

THE WITNESS: Yes, sir.

THE COURT: He also turned them over and showed you everything that was in his pockets, no?

THE WITNESS: Yes. He opened like this.

THE COURT: Didn't he show items, including an EZ Pass; is that fair to say?

THE WITNESS: Yes.

THE COURT: Then you even asked him about the EZ Pass and he said something about his car being towed, but he had two cars, or something to that effect. It's tough to hear. He explained that all to you.

THE WITNESS: Yes.

THE COURT: And this is in February of 2024?

THE WITNESS: Yes, sir.

THE COURT: Fair to say it was [cold] outside that night?

THE WITNESS: Yes, sir.

THE COURT: Fair to say that when his hands are going in that it was also cold, his hands were probably cold?

THE WITNESS: Like I said, our hands are cold, too. It's something—

THE COURT: No. I'm just asking you, it was cold outside, right?

THE WITNESS: Yes, sir.

THE COURT: When you asked him, either you or the other officer, to remove his facial mask, he complied with that as well.

THE WITNESS: Yes, sir.

THE COURT: So he was complying with those requests at that time?

THE WITNESS: Yes, sir.

*Id*. at 32:22-34:5.

The Court then asked Officer Henry whether Defendant was "free to leave at any point he wanted to leave in the middle [of] your questioning?" (*Id*. at 34:6-7.) Officer Henry responded, "Not at that time because we still had to figure out what was going on." (*Id*. at 34:8-9.) On this point, Officer Henry provided the following in response to the Court's questions:

THE COURT: I'm asking you. When you were questioning him, he could've just walked away from you guys, like, I'm just going to walk out of here. I don't want to talk to you guys. He wasn't free to leave. You're commanding him to remove his hands. You're commanding him to move something from his face.

THE WITNESS: Yes, sir.

THE COURT: Fourth Amendment is going to apply there. He can't just be like you know what? I don't want to deal with you guys. I'm walking out of here. Correct?

THE WITNESS: Yes.

THE COURT: He is there now. He is a stuck. He has to comply.

THE WITNESS: Yes.

THE COURT: In fact, your basis for searching him is that — your position is that he failed to comply —

THE WITNESS: Yes.

THE COURT: —with him keeping his hands out of his pockets, right?

THE WITNESS: Yes, sir.

6

THE COURT: That's why you searched him.

THE WITNESS: Yes, sir.

THE COURT: So at no point during this questioning is he going to be like you know what? I'm free to leave. I'm leaving, and I don't want to talk to these officers.

THE WITNESS: Yes, sir.

*Id*. at 34:23-35:23.

## II.    LEGAL STANDARD

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n.1 (1978) (citing *Simmons v. United States,* 390 U.S. 377, 389–390 (1968)). "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant has established a basis for his motion, "the burden shifts to the government to show that the search or seizure was reasonable." *Id.* "[T]he government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) (citing *Johnson*, 63 F.3d at 245). "In deciding a motion to suppress evidence, the trial court determines the credibility of witnesses." *United States v. Howard*, 787 F. Supp. 2d 330, 331–32 (D.N.J. 2011) (citing *United States v. Davis,* 514 F.2d 1085, 1088 (7th Cir. 1975)).

## III.    DISCUSSION

Defendant argues that Officers Henry and Lindo unlawfully stopped and frisked him in violation of the Fourth Amendment and the firearm seized therefore must be suppressed. (Moving Br. at 4.) Principally, Defendant contends that he was "seized" and was not free to leave or terminate his encounter with police (*id.* at 8) and that the officers did not have reasonable suspicion

to frisk him for weapons (*id.* at 10.)  In opposition, the United States argues that the Motion should be denied for two reasons.  First, the officers had probable cause to arrest Defendant for trespassing.  (Opp'n Br. at 5.)  In the alternative, the United States submits that the officers had reasonable suspicion to conduct a *Terry* stop based on their belief that Defendant had trespassed (*id.* at 9) and that they further possessed additional reasonable suspicion that Defendant was armed and dangerous sufficient to permit a *Terry* frisk, (*id.* at 14).  The Court will address each argument in turn.

### A.    PROBABLE CAUSE

The Fourth Amendment requires that a warrantless arrest be based on probable cause.  *See Paff v. Kaltenbach*, 204 F.3d 425, 435 (3d Cir. 2000); *Wright v. City of Philadelphia*, 409 F.3d 595, 601–02 (3d Cir. 2005).  "Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested."  *Paff*, 204 F.3d at 436.  Courts use a totality of the circumstances analysis to determine whether an arrest was properly based on probable cause.  *See Maiyland v. Pringle*, 540 U.S. 366, 371 (2003).  Furthermore, the crime with which a suspect eventually is charged does not control the probable cause analysis.  *Wright*, 409 F.3d at 602.  "Probable cause need only exist as to any offense that c*ould* be charged under the circumstances."  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (citing *Edwards v. City of Philadelphia*, 816 F.2d 568, 575-76 (3d Cir. 1988)) (emphasis added).

"In undertaking a probable cause determination, the starting point is the elements of the crime or crimes at issue."  *Bracken v. Manor Twp.*, 665 F. Supp. 3d 675, 693 (W.D. Pa. 2023) (citing *Wright*, 409 F.3d at 602).  Here, the United States identifies criminal trespassing.  (Opp'n

Br. at 7.)  Notably, there are three distinct types of trespass prohibited by N.J. Stat. Ann. § 2C:18-3,[4] *see State v. Braxton*, 750 A.2d 185, 188 (N.J. Super. Ct. App. 2000), and the United States does not specify which one is relevant here.  Nonetheless, the role for the Court is then to determine whether the record establishes that at the time of arrest, the facts before the officers warranted the belief that Defendant either "knowingly entered" any structure without permission, committed "unprivileged entry onto open land" or was "peering into windows . . . of dwellings," N.J. Stat. Ann. § 2C:18-3.

When considering the totality of the circumstances, the Court finds that the police did not have probable cause to effectuate Defendant's arrest based on trespassing.  To begin, the Court finds the testimony of Officer Henry, the only testifying witness and arresting officer, to be credible.  The Court examined his demeanor, manner of testifying, consistency of his testimony when compared to other evidence, including but not limited to, the body-cam videos and investigation report, and plausibility of his testimony when considering the underlying circumstances involved in this case.  Officer Henry's testimony as well as additional documentary evidence surprisingly support suppression.

Contrary to the United States' position, Officer Henry clearly and without hesitation conceded at the suppression hearing that the officers did not have probable cause to arrest Defendant for trespassing, in violation of N.J Stat. Ann. § 2C:18-3.  (Tr. at 20:14-22.)  Rather, the officers were simply investigating the 911 tip.  (*Id.*).  And yet, despite its own witness's testimony, the United States somehow maintains that the police had probable cause based on the security guard's identification of Defendant as "the man peering into cars and trying to gain access to the

---

[4] N.J.S.A. 2C:18-3 prohibits unlicensed entry of structures under subsection a, defiant trespass, or "entry onto open land after prohibitory notice of some kind has been given," under subsection b, and peering into windows or other openings of dwelling places, under subsection c.  *See Braxton*, 330 N.J. Super at 188.

building," and Defendant's "suspicious behavior," (*id*. at 67:7-71:12). Defendant, in reply, claims that this information alone does not rise to the level of probable cause to arrest him for trespassing. (Reply Br. at 1-3.) The Court agrees with Officer Henry and Defendant.

At "the critical point of inquiry, . . . the moment of arrest," the officers had nothing more than the security guard's accusation and Defendant's contradictory statement that he was there to visit someone. The officers did not review any video footage of Defendant's activities prior to approaching him. (Tr. at 46:5-10). At the time the officers did encounter Defendant, he was nowhere near, let alone peering into, any cars, (*id.* at 46:11-14.) and he immediately explained that he was there to see someone and provided the resident's apartment number. (*id.* at 29:3-18). Peering into car windows is not an element of criminal trespass, and as Officer Henry made clear in his testimony, the objective facts do not warrant a reasonable law enforcement officer to believe that Defendant committed or was committing criminal trespass. Accordingly, the Court rejects the United States' argument that law enforcement could have arrested Defendant for criminal trespass because it simply is inconsistent and not supported by the evidence in the record.

The Court now turns to the United States' alternative argument that there was reasonable suspicion to stop and frisk Defendant.

### B.    WHETHER IT WAS A VALID STOP UNDER THE *TERRY* STANDARD

Consistent with the Fourth Amendment, an officer may "conduct a brief, investigatory stop," known as a *Terry*[5] stop, upon a showing of less than probable cause. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). An officer may conduct a *Terry* stop, where the "officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Because 'this reasonable suspicion requirement is only triggered by

---

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

a seizure,'" the Court will "first 'pinpoint the moment of the seizure and then determine whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity.'"  *United States v. Scott*, 816 Fed. App'x 732, 736 (3d Cir. 2020) (alterations in original) (first quoting *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018); and then quoting *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015)).[6]

### 1.  <u>Seizure of Defendant</u>

The Court begins by determining when the seizure of Defendant occurred.  *See United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006).  "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'"  *Id.* (quoting *California v. Hodari D.,* 499 U.S. 621, 626 (1991)).  There has been a "show of authority" if "the officer's words and actions would have conveyed . . . to a reasonable person" that he was not free to leave. *Id.* (quoting *Hodari D.*, 499 U.S. at 628).  In determining whether law enforcement's conduct would lead a reasonable person to feel this way, the Court must "tak[e] into account all of the circumstances surrounding the encounter." *Florida v. Bostick¸* 501 U.S. 429, 437 (1991).

The United States claims that the initial interaction between law enforcement and Defendant "did not implicate the Fourth Amendment at all."  (Opp'n Br. at 11.)  Defendant contends that he was seized the moment the officers began interrogating him outside the rear door of the apartment building.  (Moving Br. at 7.)  Under the totality of the circumstances, the Court

---

[6] *See also United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) ("Before even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] 'seized' by the police" within the meaning of the Fourth Amendment.") (quoting *United States v. Williams,* 413 F.3d 347, 352 (3d Cir.2005))).

agrees with Defendant and finds that he was seized for purposes of a *Terry* stop from the moment the officers approached him.

First, Officer Henry candidly conceded to the Court at the suppression hearing that Defendant was not free to leave at any point during their encounter, (Tr. at 34:6-35:23), a position once again contrary to the arguments made by the United States before this Court. Further, the Court finds that there was a clear show of authority when the two officers converged on the back door, ordered Defendant to pull down his face mask and remove his hands from his pockets, and were blocking entry into the building. It was clear that Defendant was not permitted to enter the building and a reasonable person in Defendant's position would not have felt free to decline this interaction, turn, and leave. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (seizure occurs when "communication would convey to a reasonable person that compliance was not optional").

Defendant clearly submitted to this show of authority. Defendant remained in place throughout the interaction, answered the officers' questions, including informing them that he was there to see someone, and complied with their commands to pull down his face covering and remove his hands from his jacket pockets. *See United States v. Sears*, Crim No. 19-224, 2019 WL 6715603, at * 3 (D.N.J. Dec. 10, 2019) ("By fully complying with the detectives' commands to stop, [the defendant] submitted to detectives' show of authority and permitted them to effectuate a seizure.") At no point did Defendant attempt to flee or even ask to leave. *See Lowe*, 791 F.3d at 434 (holding that "when a stationary suspect reacts to a show of authority by not fleeing, making

no threatening movement or gesture, and remaining stationary, he has submitted under the Fourth Amendment and a seizure has been effectuated.").

Although submission to a show of authority requires more than "momentary compliance," submission is not always negated by subsequent acts. *Brown*, 448 F.3d at 246. In *Brown*, the Third Circuit found that a suspect who was ordered to place his "hands on the [police] vehicle" had submitted to police authority because he "demonstrated more than 'momentary compliance' with the arresting officers demands . . . by turning to face the police car and placing (or moving to place) his hands on the vehicle," even though he later fled. 448 F.3d at 244, 246 (quoting *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000)). In *Sears*, the Third Circuit concluded that "by stopping at the door and allowing the officers to approach him, [the defendant], like the suspect in *Brown*, yielded his freedom of movement and materially increased the officers' control over him, thus 'demonstrating more than momentary compliance.'" 835 Fed. App'x 671, 673 (3d Cir. 2020) (quoting *Brown*, 448 F.3d at 246) (internal quotations omitted). Thus, on the same logic as *Brown* and *Sears*, although Defendant put his hands back into his pockets after following the officers' several earlier commands—and putting aside the Court's view that this was more attributable to it being a cold night in the middle of February rather than a failure to submit—that does not negate his initial submission given the totality of the circumstances. *See United States v. Waterman¸* 569 F.3d 144, 146 (3d Cir. 2009) (finding "no submission" by the defendant where he did not comply with officers' command to show his hands and instead retreated into the house).

The Court accordingly rejects the United States' argument that Defendant was not seized. The United States' position is problematic on its face: it would have the Court accept that Defendant was required to comply with each order to remove his hands but somehow was able to ignore all the commands by simply leaving the scene. The United States cannot have it both ways.

On this record, the Court agrees with Officer Henry and Defendant and finds that Defendant was not free to leave.

### 2.    **Reasonable Suspicion**

#### a.    *Terry* stop

The next question to consider is: "Did the facts known to the officers at that moment of seizure give rise to reasonable suspicion?" *Lowe*, 791 F.3d at 431.  The United States argues that the totality of the following circumstances amounts to a reasonable suspicion on which the officers relied: (1) the information alleged by the security guard (the "tip"); (2) the description given by the security guard was a match for Defendant; and (3) Defendant's lack of an explanation for his presence at the building.  (Opp'n Br. at 13.)  Defendant contends that the tip was an insufficient basis for a stop.  (Moving Br. at 9.)

Reasonable suspicion is an "elusive concept," but requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  In evaluating whether reasonable suspicion existed, a court "must consider the totality of the circumstances, including the police officer's knowledge, experience, and common-sense judgments about human behavior." *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).

To evaluate reasonable suspicion, we consider "the totality of the circumstances," *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quotation marks omitted), including, as relevant here, (1) the tip, (2) Defendant's hands in his pockets, i.e., nervous, or evasive behavior by the suspect, and (3) the reputation of the building. [7]  In *Sears*, the Third Circuit affirmed the

---

[7] The presence of a suspect in a "high crime area," i.e., an "area of expected criminal activity" is a factor that courts can consider when determining whether police had reasonable suspicion to conduct a *Terry* stop. *Wardlow* 528 U.S.

District Court's finding that, "an individual walking away from police and making some motion towards his waistband at night outside of his home, albeit, in a high crime-area, without more does not create reasonable suspicion sufficient to detain [the defendant]," 2019 WL 6715603, at * 5. 835 Fed. App'x at 674.  Given that Defendant's hand movements and the location of the incident are akin to making a motion toward a waistband in a high crime area, the reasonable suspicion determination mostly hinges on the security guard's tip, and whether it "possessed sufficient indicia of reliability," *United States v. Nelson*, 284 F.3d 472, 481 (3d Cir. 2002).[8]

"In evaluating 'reasonable suspicion' in this context, the court considers both the reliability of the tip or informant and the content of the tip." *United States v. Goodrich*, 450 F.3d 552, 560 (3d Cir. 2006).  In deciding whether a tip is reliable, the Court considers whether: "(1) the information was provided to the police in person,. . . . ; (2) the informant could be held responsible if his allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant had recently witnessed the alleged criminal activity . . . ; and (5) the . . . information accurately predicted future activity." *United States v. Torres*, 961 F.3d 618, 623-24 (3d Cir. 2020).  "The content of the tip, concomitantly, must provide a particularized and objective basis for suspecting (1) the particular persons stopped (2) of criminal activity." *Goodrich*, 450 F.3d at 560 (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonable suspicion here at

---

at 124.  However, this is not alone sufficient to establish reasonable suspicion.  *See Brown*, 448 F.3d at 251.  At the suppression hearing, Officer Henry testified that he had responded to the building "50 times or less" and made "5 or less" arrests, in response to "suspicious persons, domestics, robberies, [and] shootings." (Tr. at 13:22-14:13.)  The United States neither argued in its briefing to the Court that this area is a "high crime area" for *Terry* purposes nor did Officer Henry testify to such fact.  To the extent the United States attempted to make this argument during the suppression hearing, prompting an objection from defense counsel, (*id*. at 72:2-19), the evidence presented does not support such a claim.  Notwithstanding, the Court does accept Officer Henry's testimony about his prior knowledge of the location. *See United States v. Fogle*, 515 F. Supp. 2d 474, 484 (D.N.J. 2007) (explaining that relevant factors in evaluating the totality of the circumstances include "the reputation of the area in which the stop occurred for criminal activity").

[8] "It is well settled that reasonable suspicion can be based on information received from another person." *Id.* at 483. Tips, however, vary in their value and reliability, and thus, in the appropriate weight to be given. *Id.* Therefore, "some tips, . . . would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Id*. (quoting *United States v. Nelson*, 284 F.3d 472, 479 (3d Cir. 2002)).

issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.")).

Here, the dispatch communication stated that a male "tried to get into the building but doesn't live there and then he started checking cars in the back." (Ex. B.) When officers arrived on scene, however, they spoke briefly with the security guard but did not ask for or observe any video footage of Defendant's prior activity which would corroborate her accusation to dispatch. (Tr. at 45:8-46:10.) When the officers approached Defendant, he was standing outside the back door of the building with his hands in his pockets next to an unidentified woman, both of whom were trying to get inside the building. (*Id.* at 14:25-15-3.) Defendant did not have identification but when asked why he was at the building, Defendant responded, "to see someone." (*Id.* at 15:13-15, 16:5-6.) Although Officer Henry testified that Defendant never offered the name of the individual he claimed to visit, Officer Henry also conceded during his testimony at the suppression hearing that he never asked Defendant for the name. (*Id.* at 29:3-24.) Nonetheless, Defendant offered on his own the apartment number of the resident that he was there to visit. (*Id.* at 29:10-12.) The officers never even asked Defendant about the initial claim of him "checking cars in the back." The officers failed to conduct any sort of basic investigation or follow up. (*Id.* at 29:16-24, 50:1-19.)

In contrast, the officers investigated the claims made by the other woman standing with Defendant who told police that she lived there. (*Id.* at 22:25-23:5.) When she was asked for her identification, the woman claimed her license displayed a different address. (*Id.* at 23:6-12.) The officers then neglected to even check the identification at all (Ex. D). Soon after, the officers ultimately allowed her to enter the building after an unidentified male standing in the hallway of the building claimed to know her and the security guard said that the woman lives there. (Tr. at

23:13-24:3.)    It is unclear why the officers did not conduct such basic inquiry concerning Defendant's claims of visiting someone at the location.  Had they done so, the officers would have easily learned the information that was provided by Defendant and Ms. Smith in their respective affidavits which is that Defendant was there to see his girlfriend.  (Exs. F and G.)  What is clear to the Court is that the officers treated Defendant differently from the woman even though the woman demonstrated hostility to the officers during their limited encounter.  (*Id.* at 32:14-21.)

Further, at the suppression hearing, Officer Henry's testimony that he responded to the building "50 times or less" (*id.* at 13:18-24) is contextualized by the fact that he made "5 arrests or less" at that location (*id*. at 14:8-13).  Based on Officer Henry's history with the location, he is well aware that there is a high likelihood that no arrest will occur when he is called to that location.

Moreover, "peering into cars" is not criminal in nature.  Officer Henry conceded as much at the suppression hearing as well as confirmed that he could not charge someone with "peering into vehicles." (*Id.* at 50:20-51:3.)  The Third Circuit has reiterated that "the activity of which the detainee is suspected must actually be *criminal*."  *Goodrich*, 450 F.3d at 563.  Although "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000), this is not necessarily unusual or suspicious behavior.  And as described above, the officers had no direct knowledge of Defendant peering into any cars as the officers did not witness this alleged behavior.  (Tr. at 46:11-14).  They also did not bother to request or review any video footage of Defendant peering into cars.  (*Id*. at 27:20-28:3, 46:5-10.)   And they did not ask Defendant whether he was peering into cars.  Additionally, Officer Henry admitted that he was unaware of the security guard's level of training, if any, or anything else regarding her background.  (*Id.* at 24:24-25:14.)

The Court, however, considers the totality of the circumstances, not each fact in isolation. *Navedo*, 694 F.3d at 468, 470. Under the totality of the circumstances—where (1) Defendant was standing at the back door of an apartment building with his hands in his jacket pockets on a cold February night; (2) Defendant immediately informed the officers that he was there to visit someone and provided the apartment number of the resident he intended to visit; (3) the officers were familiar with the location where the incident occurred but majority of times that the officers have been called to that location, they did not make an arrest; (4) the officers did not corroborate the claim that Defendant was seen "peering into cars" and trying to get inside the building through a request for or review of any video footage nor did they even question Defendant about this claim; and (5) the officers did not treat Defendant equally to a more hostile female individual standing next to Defendant who arguably posed a similar threat as Defendant—officers did not have reasonable suspicion sufficient to detain Defendant. The Court recognizes that legal, innocent acts may together amount to reasonable suspicion, *see Ubiles*, 224 F.3D at 217, but the record is devoid of additional evidence suggesting that Defendant was engaged in criminal activity. The Court therefore finds that the officers did not have reasonable suspicion to conduct a *Terry* stop.

b. *Terry* frisk

Nevertheless, a "brief investigative stop allowed under *Terry*, is just that; a brief stop to allow police to investigate" *United States v. Bey*, 911 F.3d 139, 146 (3d Cir. 2018), but the validity of the initial *Terry* stop does not end the Court's inquiry. Therefore, even if the initial stop of Defendant may have been justified at its inception to investigate the tip received, the officers proceeded to conduct a frisk of Defendant. Notably, "[t]he stop and the search are independent actions, and each requires its own justification." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (citing *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). Thus, the subsequent frisk

of Defendant's person must also have been reasonable under the Fourth Amendment.  The Court concludes that it was not.

A person subject to a warrantless *Terry* stop "may be frisked for weapons if the police have a reasonable belief that the person is armed and dangerous."  *United States v. Connolly*, 349 Fed. App'x. 754, 756 (3d Cir. 2009) (citing *Terry*, 392 U.S. at 27).  "In reviewing a . . . *Terry* frisk for reasonable suspicion, 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  *Id.* at 757 (quoting *Terry*, 392 U.S. at 27).

The United State claims that the specific and articulable facts which support the officers' belief that Defendant was armed and dangerous include 1) the security guard's tip and (2) Defendant's placement of his hands in his jacket pockets.  (Opp'n Br. at 15.)  First, a key problem is that the information conveyed by the security guard does not support the officers' reasonable suspicion that Defendant was armed and dangerous.  Notably, there was no allegation that Defendant was seen carrying a gun.  This case is therefore distinguishable from *United States v. Gatlin*, where "because the officers believed [the defendant] to have a firearm," based on a tip, "they were permitted by *Terry* to conduct a limited search for weapons."  613 F.3d 374, 379 (3d Cir. 2010); *see also United States v. Valentine*, 232 F. 3d 350, 354–55 (3d Cir. 2000) (finding a tip from a man who told police he saw the defendant with a gun sufficient to constitute reasonable suspicion).  Further, the tip did not include an allegation that Defendant engaged in a violent crime or perpetrated a violent assault.  *See United States v. Roane,* 356 Fed. Appx. 564, 566 (3d Cir. 2009) (finding officer's protective frisk was reasonable where a suspect matched the description given by a robbery victim even though the robbery victim had not specifically mentioned a weapon).

19

Second, caselaw is clear that hand movements are not enough to justify reasonable suspicion for a *Terry* frisk. *See United States v. Alvin*, 701 Fed. App'x 151, 155 (3d Cir. 2017) (finding that defendant's nervousness was insufficient to justify a stop, reasoning that it is "certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer"); *see also United States v. Price*, Crim No. 20-974, 2021 WL 6062341, at *6 (D.N.J. Dec. 2021) ("Defendant's hand movements near his waist band while in a high crime area does not alone constitute a reasonable articulable suspicion."); *accord Sears*, 2019 WL 6715603, at *4 (D.N.J. Dec. 10, 2019) (Martini, J.), *aff'd,* 835 F. App'x 671 (3d Cir. 2020) ("[M]aking an adjusting or lifting motion towards his waistband . . . is too innocuous and frequent an occurrence, without indication of something more . . . to suggest that criminal activity is afoot.").

Here, Officer Henry testified that he and Officer Lindo relied solely upon Defendant placing his hands in his pockets to justify the search. (Tr. at 35:12-19, 52:23-25.) Specifically, Officer Henry responded "no, he just kept reaching in his . . . pockets" when defense counsel asked "[t]here was nothing else he did that made you feel unsafe, correct?" (*Id.* at 53:1-5.) The overall circumstances, however, are much more nuanced than that.

First, as can be seen on the bodycam footage, at the time the officers initially opened the back door and saw Defendant, Defendant already has his hands in his pockets. (ex. D, 1:58), and the officers did not immediately ask him to remove them, (*id.* at 48:1-9). This demonstrated that the officers did not believe that Defendant, having his hands in his pockets at the time they approached him, was an immediate threat. Indeed, Officer Henry testified that it was not an immediate threat to the officers' safety that Defendant's hands were in his pockets at the start of their encounter. (*Id.* at 48:10-14.) Thereafter, once the woman entered the building, officers asked

Defendant if he had identification or "anything on him" and, for the first time, "to take his hands out of his pockets." (Ex. D, 2:54-3:06.) Defendant complied and removed an EZ pass and some small pieces of paper which resemble receipts. (*Id.* at 3:06-3:10.) Officer Henry actually inquired further here about the E-Z Pass, and Defendant explained that one of his vehicles was previously towed from the parking area. (*Id.* at 3:10-3:15). At this point, Officer Henry asked Defendant to remove his mouth covering because he could not hear Defendant. (*Id.* at 3:15-3:18.) Defendant complied. (*Id.*).

Then, Defendant, with the items from his pockets still in his hands, put his hands back into his pockets.[9] (*Id.* at 3:19.) Officer Henry then asked Defendant if he lived there, and Defendant responded that he is "going to see 8E." (*Id.* at 3:20-3:24.) At this time, Officer Lindo said to Defendant, "can you keep your hands out of your pockets" (*id.* at 3:24) and as Defendant began to remove them again, Officer Lindo ordered Defendant to put his hands against the wall for a frisk, (*id.* at 3:24-3:34). Therefore, after being asked to remove them, Defendant returned his hands to his pockets only once before being subjected to a frisk. Importantly, it is not disputed that the temperature that evening was cold. Officer Henry acknowledged as much during his testimony. (Tr. at 33:12-23.) At no time prior to the search did Defendant express any hostility towards the officers. (*Id.* at 32:14-21.)

What is noticeable though is how the officers treated the unidentified woman standing next to Defendant differently than Defendant. Namely, it is unclear why the officers were not concerned about her potential safety risk given that this unidentified woman expressed hostility

---

[9] At the suppression hearing, Officer Henry testified that Defendant took items out of his "top" pockets, but that Defendant had his hands in his "lower pockets" at another point in the encounter and did not show the officers what was in his "lower pockets." (Tr. at 31: 4-12). Upon review of Officer Lindo's body cam footage, (ex. D), Defendant took items out of his "top" pockets and then returned his hands to the same top pockets before being told to put his hands on the wall for a pat down. Regardless, Officer Henry also never explained why he was so willing to accept Defendant's "show and tell" with one set of pockets to provide assurance for his security, but not another.

toward the officers, carried a bag that could easily hold a firearm and whose identification contradicted her claim that she lived in the building. (*Id.* at 23:3-13, 46:18-47:9.)  Nevertheless, the officers conducted themselves as they should—they inquired about the woman and determined from an unidentified male and the security guard that the woman lived at the location.  The officers then permitted the woman to enter the building.

In their argument to the Court at the suppression hearing, defense counsel claimed that the disparate treatment was due to Defendant being a tall, black male. (*Id*. at 80:21-22.)  The Court will not speculate on the motive behind the disparate treatment but does find that the officers clearly treated Defendant differently that the unidentified woman throughout the officers' encounter with each of them.  Stating the obvious, the Court can only imagine how things would have played out for Defendant if the officers treated him in the same manner they treated the unidentified woman.  Undoubtedly, the officers would have readily learned the information outlined in the affidavits of both Defendant and Ms. Smith. (Exs. F and G.)  And as a result, Defendant would likely have visited his girlfriend that evening protected from the cold without the consequences of what would happen next resulting in multiple state charges and the instant federal offense for unlawful possession of a firearm.

Nevertheless, the Court finds that at the time of the seizure, the officers had objectively observed nothing more than Defendant complying with multiple commands regarding his hands and mouth covering before putting his hands back into his pockets after having just emptied his pockets on a cold February night.[10]  *See United States v. Harris*, 604 F. Supp. 3d 309, 317 (E.D.

---

[10] This case is distinguishable from *United States v. Hill* where the Third Circuit found that the defendant repeatedly returning his hands to his pockets suggested he might have been armed or in possession of contraband.  811 Fed. App'x 761, 764 (3d Cir. 2020).  There, police received complaints from residents "about problems with individuals not from the block sitting on the steps of the neighbors' properties" in an area that had a history of shootings and nonresidents congregating in front of homes.  *Id.* at 763.  While on patrol in the area at 1:00 a.m. in July, police asked two men on the steps of a home whether the men lived there but despite answering that they did, they could not provide the house number, could not unlock the door with their keys and were evading the officer's questions.  *Id.*  Police also

Pa. 2022) (rejecting a defendant's hand placement in pockets as giving rise to reasonable suspicion, reasoning that, on a cold December night, he might have been trying to keep his hands warm rather than reach for a gun).  Although Officer Henry testified that the officers' reasonable articulable suspicion was based solely on Defendant's hand movements in his pockets, (Tr. at 34:1-8)—which does not alone amount to reasonable suspicion that Defendant is armed and dangerous,—the Court acknowledges that it is "not limited to what the stopping officer says or to evidence of his subjective rationale" in determining whether the frisk was justified.  *United States v. Jackson*, 120 F.4th 1210, 1223 (3d Cir. 2024) (quoting *United State v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000)).

Instead, the Court, in its assessment of the record as a whole and "the circumstances that the officers faced against an objective standard," concludes that the facts available to the officers at the moment of the seizure did not "warrant a man of reasonable caution in the belief that the action taken was appropriate."  *See id*.  (internal quotations omitted).  That is, the Court does not find that a reasonable officer in these circumstances would have been suspicious given that the officers did not immediately view Defendant's hands in his pockets as a threat, Defendant put his hands back into his pockets only after he was asked to remove them once to which he complied, and Defendant had previously showed the officers what was inside them where the officers inquired briefly about the contents and accepted Defendant's explanation.  *Id.*

Although Officer Henry testified at the suppression hearing that officers can conduct a *Terry* frisk "[a]t any time [they] don't feel safe" (Tr. at 52:13-22.), his subjective belief as to when he may conduct a *Terry* frisk is irrelevant and importantly, misstates the applicable legal standard—the question the Court must answer is "whether 'a reasonably prudent [officer] would

---

noticed one man angle his body away from police and put his hands in his sweatshirt pocket.  *Id.*  Taken together, the court found these facts gave officers reasonable suspicion that the men did not live there and might have been armed.

be warranted in the belief that his safety or that of others was in danger." *Jackson*, 120 F.4th at 1223.

Ultimately, despite giving the officers' experience and specialized knowledge the deference it deserves, the factors present in this case do not amount to reasonable suspicion sufficient to warrant a frisk of Defendant for weapons. That is, based on the factual record and the testimony elicited at the suppression hearing, the Court concludes that the officers did not have a reasonable belief, based on specific and articulable facts, to conduct a frisk of Defendant. Therefore, the firearm seized must be suppressed in accordance with the Fourth Amendment.

As the Third Circuit explained, the Court "realize[s] that it is in the interest of public safety and the safety of police for officers to be able to ascertain whether people are armed." *Lowe*, 791 F.3d at 435–36. And the Court is mindful that Defendant is not someone who should be in possession of a firearm given that he has prior convictions for felony offenses that would render him prohibited from possessing a firearm. (ECF No. 1, Opp'n Br. at 3-4.) Nevertheless, our Constitution protects all of us, or none of us. The price of those protections afforded him, and the public, is the exclusion of the firearm in this case. To hold otherwise, under these specific factual circumstances, would incur the much higher price of undermining our constitutional rights. That is not a price this Court is willing to pay now in this case, or ever.

In light of the Court's decision to grant the portion of Defendant's motion seeking to suppress the firearm, the Court will reserve as to the remainder of the relief sought by Defendant. Instead, the United States will be ordered to advise the Court by December 30, 2024, how it wishes to proceed as to this case, including the remainder of Defendant's Motion.

IV.    **<u>CONCLUSION</u>**

For the reasons stated above, the Court will **GRANT** the portion of Defendant's Motion seeking to suppress the firearm and **RESERVE** as to the remainder of the relief Defendant seeks. An appropriate Order will follow.


Date: December 16, 2024

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
